**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**JAMES E. COLE,**

      **Petitioner,**

      **v.**

**WARDEN, LEBANON**
**CORRECTIONAL INSTITUTION,**

      **Respondent.**

              **CASE NO. 2:14-CV-00578**
              **JUDGE GEORGE C. SMITH**
              **Magistrate Judge Elizabeth P. Deavers**

**ORDER and**
**REPORT AND RECOMMENDATION**

      Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court on the *Petition* (ECF No. 1), the *Return of Writ* (ECF No. 6), Petitioner's *Reply* and *Second Reply* (ECF Nos. 7, 9), and the exhibits of the parties.[1]  Petitioner's *Pro Se Motion to Exceed the Normal Page Limitation* (ECF No. 1-1, PageID# 70) is **GRANTED.**  For the reasons that follow, the Magistrate Judge **RECOMMENDS t**hat this action be **DISMISSED.**  Petitioner's request for an evidentiary hearing and *Pro Se Motion to be a Witness and to be Called as a Witness* (ECF No. 7, PageID# 627) are **DENIED**.

**Facts and Procedural History**

      The Ohio Tenth District Court of Appeals summarized the facts and procedural history of the case as follows:

> Appellant was indicted on six counts of rape, first-degree felonies, in violation of R.C. 2907.02. Three of the rape counts pertained to appellant having vaginal intercourse with children under 13 years

---

[1] Petitioner also has attached in support of the Petition, a *Pro Se Motion for Wrongful Imprisonment* (ECF 1-1, PageID# 56); *Pro se Motion to Discharge* (PageID# 61); and  *Affidavit in Support* (PageID# 72).

of age, one of the rape counts pertained to a child under the age of 13 engaging in fellatio with appellant, and two of the rape counts pertained to appellant forcing another to engage in vaginal intercourse. Appellant was also indicted on one count of gross sexual imposition, a third-degree felony, in violation of R.C. 2907.05, and one count of sexual battery, a third-degree felony, in violation of R.C. 2907.03. Appellant pleaded not guilty to the charges, and a jury trial commenced.

The case went to trial in May 2012, and the following facts were established. Appellant was previously married to K.H. and B.H.'s mother, D.T., and had previously dated L.R. and P.R.'s mother, T.K. When appellant's separate relationships with D.T. and T .K. ended, he continued to visit with their children, and the children became acquainted with one another. All of the children referred to appellant as "Dad."

P.R. testified that on August 16, 2009, when she was 13 years old, she spent the night with L.R. at appellant's home. Sometime after midnight, appellant came out to the living room where P.R. was watching television, and he started to rub P.R.'s leg. Appellant told P.R. that he would kill her if she told her mother about what he was going to do. He then removed her clothes and asked if she would make love to him. Although she told him no, he put her hands above her head and put his penis in her vagina. P.R. told appellant to get off of her, but he continued to hold her hands above her head. He eventually stopped and went to his bedroom.

According to P.R., appellant returned to the living room about three hours later, grabbed her arm, took her to his bedroom, and laid her down on the floor. Appellant again asked P.R. if she wanted to make love with him. Despite P.R. answering no, appellant took off P.R.'s clothes, got on top of her, put her hands above her head, and put his penis inside her vagina. Appellant stopped when P.R. started bleeding. P.R. did not tell anyone about the incident, but wrote a note to herself two nights after the rape in an effort to help her cope with the rape. The note contained the statement, "what 36 year old would want to take a 13 year old['s] virginity[?]" (State's Ex. B1.)

After the rape, P.R. started to not get along with her mother, and she engaged in self-mutilation. She was also in and out of the psychiatric ward around that time period. P.R. stated she did not immediately disclose the sex abuse to her mother because she believed appellant's threats and was scared. Approximately two months after the incident, P.R. got into an argument with her

mother and stepfather. After her mother left the house, P.R.'s stepfather commented on P.R.'s behavioral changes. At that time, P.R. told her stepfather that she had been raped by appellant. P.R. also told her stepfather that she had sex with another boy two months after the rape and that the boy called P.R. to tell her that he thought she had given him Chlamydia. According to P.R., she felt safe talking about the rape at that time because appellant was not allowed to come to her house due to an unrelated feud between him and P.R.'s mother. P.R.'s stepfather contacted P.R.'s mother and told her about his conversation with P.R. In December 2009, after P.R. disclosed the sex abuse, her mother took her to be interviewed and examined at the Center for Child and Family Advocacy ("CCFA").

L.R. testified that appellant sometimes gave her money, and that he would give her, B.H., K.H., and P.R. marijuana, alcohol, and cigarettes. When L.R. visited appellant by herself, she slept with him in his bed. L.R. testified that around September 2009, when she was ten years old, she and appellant were in bed together, and appellant touched her on top of her clothes, pulled down her shorts, and touched her vagina. She claimed that she pulled her shorts up and told appellant to stop and leave her alone. Appellant left and went into the kitchen.

According to L.R., that same night, about two hours later, appellant came back into the bedroom. He was not wearing a shirt and his boxers were down around his knees. Appellant pulled L.R.'s shorts and underwear down to her knees. L.R. was lying on her side, and while appellant was behind her, he rubbed her vagina with his hands and put his penis inside her vagina. L.R. told appellant to stop, but he refused to do so until she slapped him.

L.R. testified she did not immediately tell anyone that appellant raped her because she did not want to ruin her relationship with K.H. and B.H. At some point, L.R. told P.R. that she was going to implicate their stepfather in the sex abuse, and, in fact, L.R. blamed him for the sex abuse during a time she spoke with children services. The testimony does not reveal specifically when these conversations took place with P.R. or children services.

In December 2009, L.R., along with her sister, was taken to CCFA to be interviewed and examined. L.R. told CCFA personnel that appellant rubbed her vagina. Subsequent to this interview, L.R. told a sheriff's detective that she was truthful in her interview with CCFA personnel. At trial, she recanted her statement about her stepfather sexually abusing her and admitted that he had not.

T.K. testified that appellant's relationship with L.R. started out parental, but then turned into a "lover's relationship." (Tr. Vol.I, 193.) According to T.K., L.R. and appellant would go everywhere together, and L.R. would sit on appellant's lap and kiss him on the lips. T.K. also testified that L.R. told her, after the interview at CCFA, that her stepfather sexually abused her, but she recanted that statement two or three weeks later. T.K. next testified that she noticed a change in P.R.'s behavior around the end of August 2009. P.R. was not doing well in school, and she fought and hit T.K. several times.

Franklin County Sheriff Deputy Declan Ferry testified that he and Deputy Kenneth Couch went to appellant's residence in late 2009 to discuss the sex abuse accusations pertaining to L.R. and P.R. Deputy Ferry stated that a man was outside the house claiming to be the father of the two girls who were sexually abused by appellant. Deputy Ferry noted that he and his partner did not find appellant at the residence. They instead saw a man fleeing from the area, and the father of the two victims pointed to the fleeing man and said, "there's the guy you're looking for." (Tr. Vol.I, 244.) Deputy Ferry yelled for the fleeing man to stop, but the man kept going. John Shankle lived with appellant at the time and testified that, when the police showed up at their residence, appellant escaped through a bedroom window.

Franklin County Sheriff Detective Kevin Foos testified that he tried to find appellant after he fled from Deputies Ferry and Couch. Detective Foos discovered that appellant fled to Tennessee but eventually returned to Ohio on January 19, 2010. On January 20, 2010, Detective Foos spoke with P.R. and L.R. about the sex abuse. P.R. was cooperative, but L.R. was upset and said that she loved appellant and was going to be with him when she was 18 years old.

Columbus Police Detective Sterling Trent testified that he spoke with L.R. in September 2011, approximately one and one-half years after L.R. talked with Detective Foos. L.R. told Detective Trent more than what she had disclosed during her initial interview at CCFA. Detective Trent explained that children "may talk about some of the things that happened and leave it at that when [they] first discuss" sex abuse. (Tr. Vol.I, 513.)

B.H. testified that, when she and K.H. visited appellant, she would sometimes sleep with appellant in his bed, and K.H. would sleep in another room. B.H. alleged that appellant put his penis inside her

4

vagina on 13 different occasions during her visits between 2010 and 2011—the first time occurring when B.H. was ten years old, and the last time when she was 11 years old. B.H. denied at trial that appellant's hands or mouth touched her body or that she touched appellant's penis with her hands or mouth. She testified that K.H. walked in on them once when she was being sexually assaulted by appellant.

B.H. also testified that, when appellant's wife, V.C., moved in with him, the sexual abuse continued, although no abuse happened in front of her. B.H. cared for V.C. and called her "Mom," and B.H. explained that she did not immediately tell anyone about the sex abuse because she was scared that revealing the information would result in her not being able to see V.C. (Tr. Vol.I, 296.)

In May 2011, B.H. was taken to CCFA when she complained that her "private part" felt like it was "burning." (Tr. Vol.I, 299.) She did not tell anyone at CCFA about appellant sexually abusing her. In August 2011, B.H. was taken to CCFA again after it was revealed that she was having sex with her cousin. Before going to CCFA, B.H. told her mother about appellant sexually abusing her. B.H. admitted telling V.C. in a phone conversation in October 2011 that it was her Uncle J., and not appellant, who sexually abused her. B.H. also said during that conversation that she told her mother about Uncle J. abusing her, but that her mother did not believe it. B.H. testified that she did not implicate appellant during this conversation because she did not want to ruin her relationship with V.C.

K.H. testified that appellant would sometimes give him and B.H. money. He additionally noted that appellant would give B.H. gifts and that she was "spoiled" by appellant. (Tr. Vol.I, 360.) K.H. also discussed three incidents in which he saw appellant and B.H. engage in inappropriate activity. During the first incident, K.H. was in appellant's bedroom playing a videogame when he fell asleep. He later woke up and saw appellant in bed moving up and down on top of B.H. and noticed that appellant and B.H. had their clothes on the floor. K.H. did not say anything to appellant or B.H. During the second incident, K.H. went in appellant's bedroom to see B.H. rolling off the top of appellant in bed. The third incident occurred at the home of appellant's mother. Appellant and B.H. were lying together on the couch. K.H. was watching a movie in the same room and glanced over to see if B.H. was watching the movie. K.H. noticed that appellant was lying flat, but sideways. A blanket was partially covering appellant and B.H. From the waist up, B.H. was completely covered by the blanket, and she was

positioned by appellant's waist and facing toward him. The blanket was moving side-to-side, and appellant's hands were on top of the blanket. K.H. concluded that he was witnessing a "blow-job," which is a term he understands to mean a "girl using her mouth on a man's penis." (Tr. Vol.I, 390.)

K.H. claims he did not tell his mother what he saw until months after the incidents because he was afraid of appellant. He recalled a time when appellant beat him for spray painting some chairs.

Paula Samms is a former forensic interviewer at CCFA and interviewed P.R. and L.R. in 2009. Samms testified as follows about those interviews. P.R. said that appellant raped her twice in one night. L.R. discussed an incident in which appellant was lying behind her in bed and put his hands down her pants to rub the outside of her vagina. L.R. said that appellant left her alone when she slapped him.

Samms also discussed her experiences with children's disclosure of sex abuse. She noted that most children do not disclose everything about their sex abuse all at once. She additionally indicated that children who have been sexually abused may experience changes in their behavior such as having trouble at home or at school or injuring themselves.

Jennifer Westgate, a forensic interviewer at CCFA, interviewed B.H. in May and August 2011, and she testified as follows about those interviews. During the May interview, B.H. did not disclose any sexual abuse. However, during the August interview, B.H. said that appellant fondled her and vaginally raped her multiple times. Westgate was not surprised that B.H. did not reveal the sex abuse during the May interview because a child's disclosure of sex abuse "can be a process." (Tr. Vol.I, 481.) In discussing a child's disclosure of sex abuse in general, Westgate said that it would not surprise her if a child recanted a sex abuse disclosure only to reaffirm it later. She further noted that children may not feel comfortable disclosing certain acts of sex abuse, and that it is sometimes very difficult for parents to learn that their children were forced to engage in oral sex.

Gail Horner, a pediatric nurse practitioner at CCFA, testified that, in December 2009, she conducted physical exams on P.R. and L.R. She said that P.R.'s exam was normal. However, Horner testified that 90 to 95 percent of children who have been sexually abused have normal exams. Horner also testified that L.R.'s exam revealed a tear in her hymen. According to Horner, this tear could not be

explained by someone merely fondling or touching her hymen or vagina and testified that the tear was consistent with vaginal intercourse.

Horner also testified that she examined B.H. in August 2011, and that she discovered nothing abnormal except that B.H. tested positive for a sexually transmitted infection. According to Horner, either appellant or the boy that B.H. had sex with four days prior were the possible sources for the disease. However, due to the seriousness of the infection, Horner thought that it would be more likely that she had the disease longer than four days.

Horner further testified that a child's disclosure of sex abuse "is a process." (Tr. Vol.I, 542.) She noted that "children don't always disclose everything that happens to them at once. They kind of test the waters and want to see what is the result of their disclosure, or emotionally, they're not ready to disclose." (Tr. Vol.I, 542.) Horner further stated that L.R.'s process of disclosure was hindered by the fact that "she was very emotionally attached to her perpetrator." (Tr. Vol.I, 542.)

After the prosecution rested its case-in-chief, appellant moved for an acquittal, pursuant to Crim.R. 29, on the rape by fellatio count pertaining to B.H. The trial court denied the motion.

Appellant testified on his own behalf and denied forcing P.R. into having sex with him. He also denied sharing a bed with L.R., touching her inappropriately or having sex with her. He additionally denied having sex with B.H. Appellant claimed that he fled from the police in late 2009 because he was worried about an existing warrant for his arrest and claimed he did not know about the sex abuse accusations at that time. The prosecution questioned appellant on why there was no record that a warrant existed at that time, and appellant responded that he received a letter notifying him of the warrant. He explained he fled to Tennessee and stayed with his father, who was sick. While in Tennessee, appellant learned that the police were still looking for him, and he returned to Ohio and went to the police on January 19, 2010. Appellant was placed in custody for ten days. Appellant lastly admitted to giving P.R. and L.R. cell phones as gifts.

Appellant rested and renewed his Crim.R. 29 motion on the rape by fellatio count pertaining to B.H. The motion was denied. The jury found appellant guilty on all charges except for Count 2, which was a count alleging vaginal rape of B.H. The trial court sentenced appellant to prison for 29 years to life.

II. ASSIGNMENTS OF ERROR

Appellant filed a timely notice of appeal and assigns the following as error:

[I.] The trial court erred by overruling appellant's Crim.R. 29 motion for judgment of acquittal and thereby deprived appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution.

[II.] The trial court violated appellant's right to due process as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution by entering verdicts of guilty, as the jury's verdict was against the manifest weight of the evidence.

*State v. J.R.C., Jr.*, No. 12 AP 584, 2013 WL 1943998, at *1-5 (Ohio App. 10th Dist. May 9, 2013). On May 9, 2013, the appellate court affirmed the judgment of the trial court. *Id.* On September 25, 2013, the Ohio Supreme Court dismissed the appeal. *State v. J.E.C., Jr.,* 136 Ohio St.3d 1495 (Ohio 2013).

On July 11, 2013, Petitioner filed an application to reopen the appeal pursuant to Ohio Appellate Rule 26(B). (ECF No. 6-1, PageID# 283.) On October 24, 2013, the appellate court denied Petitioner's application. (ECF No. 6-1, PageID# 330.) Petitioner did not file an appeal of this decision.

On June 16, 2014, Petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He asserts that the evidence is constitutionally insufficient to sustain his convictions (claim one); and that his convictions are against the manifest weight of the evidence (claim two). Although Petitioner does not indicate on the form for the filing of his *Petition* that he also intends to raise a claim of the denial of effective assistance of trial counsel, he plainly raises the issue in his documents in support of the *Petition.* (*See, e.g.,* ECF 1-1,

PageID# 19, 23; ECF No. 9, PageID# 681-82). The Court therefore liberally construes the *Petition* to raise a third claim relating to the denial of effective assistance of counsel.[2] Both the Respondent and the Petitioner will have the opportunity to address the Magistrate Judge's recommendation as to the disposition of this claim in any objections to the *Report and Recommendation.*

It is the position of the Respondent that Petitioner's claims are procedurally defaulted and lack merit.

**Procedural Default**

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the highest court of the state for consideration. 28 U.S.C. § 2254(b), (c). If the petitioner fails to do so, but the state still provides a remedy to pursue, his or her petition is subject to dismissal for failure to exhaust state remedies. *Id.; Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Deitz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004). If, because of a procedural default, the petitioner can no longer present the relevant claims to a state court, the petitioner also waives the claims for purposes of federal habeas review unless he or she can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Coleman,* 501 U.S. at 724; *Murray v. Carrier*, 477 U.S. 478, 485 (1986).

---

[2] "Federal courts have a duty to liberally construe the pleadings of pro se litigants." *Fleming v. Knab*, No. 1:11-cv-244, 2011 WL 6812792, at *1 (S.D. Ohio Dec. 28, 2011) (citing *Haines v. Kerner*, 404 U.S. 519 (1972); *Urbina v. Thoms*, 270 F.3d 292, 295 (6th Cir. 2001)).

In the Sixth Circuit, a court must undertake a four-part analysis to determine whether procedural default is a bar to a habeas petitioner's claims. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also Scuba v. Brigano*, 259 F. App'x. 713, 718 (6th Cir. 2007) (following the four-part analysis of *Maupin* ). Specifically, the United States Court of Appeals for the Sixth Circuit requires the district courts to engage in the following inquiry:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . . Third, the court must decide whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim.

*Maupin,* 785 F.2d at 138 (internal quotations omitted). Finally, if "the court determines that a state procedural rule was not complied with and that the rule [has] an adequate and independent state ground, then the petitioner" may still obtain review of his claims on the merits if he establishes: (1) a substantial reason to excuse the default and (2) that he was actually prejudiced by the alleged constitutional error. *Id.* 'Cause' under this test "must be something external to the petitioner, something that cannot fairly be attributed to him[;] . . . some factor external to the defense [that] impeded [ ] efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753. This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level or failure to appeal at all. *Id* at 750.

Nevertheless, "'[i]n appropriate cases' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray,* 477 U.S. at 495 (quoting *Engle v. Isacc*, 456 U.S. 107, 135 (1892)). Petitioners who fail to show cause and prejudice for procedural default may nonetheless receive a review of their claims if they can demonstrate that a court's refusal to consider a claim

would result in a "fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750; *see also Lott v. Coyle,* 261 F.3d 594, 601–02 (6th Cir. 2001) (same). The fundamental miscarriage of justice exception requires a showing that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

In claim one, Petitioner asserts that the evidence is constitutionally insufficient to sustain his convictions. Petitioner did not raise this claim in the Ohio Court of Appeals. He argued there only that the evidence was constitutionally insufficient to sustain his conviction on Count 3 of the *Indictment*, which charged him with unlawfully engaging in fellatio with B.H., a child under thirteen years of age.[3] Petitioner's failure to raise on appeal a claim that the evidence was constitutionally insufficient to sustain the remainder of his convictions constitutes a clear procedural default based on the rule in Ohio that errors which appear on the face of the record must be raised on direct appeal or will be deemed forfeited. If petitioner were to attempt to raise his claim of insufficiency of the evidence by any other means, it would be barred by Ohio's doctrine of *res judicata. See State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail,* 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175.

Petitioner also asserts that he was denied effective assistance of counsel. Petitioner also failed to raise this claim on appeal, where he was represented by new counsel. He therefore likewise has committed a clear procedural default of his claim of ineffective assistance of counsel.[4]

---

[3] Petitioner asserted that the remainder of his convictions were against the manifest weight of the evidence.

[4] To the extent that Petitioner's claim of ineffective assistance of counsel may rely on evidence not readily apparent from the face of the record, the claim would be properly raised in a petition for post conviction relief pursuant to O.R.C. § 2953.21. Petitioner never pursued such action.

The procedural rule barring petitioner's claims constitutes an adequate and independent state ground for denying relief. The requirement that all available claims be asserted in the first appellate proceeding serves the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. Further, Ohio's *res judicata* rule is adequate and independent under the third part of the *Maupin* test. The doctrine of *res judicata* is stated in unmistakable terms in numerous Ohio decisions. Ohio courts have consistently refused to review claims on the merits under that doctrine. *See State v. Cole; State v. Ishmail; State v. Perry.*

Petitioner still may obtain review of his claims if he can establish cause for his procedural defaults as well as actual prejudice from the alleged constitutional violations. The Supreme Court has said that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray,* 477 U.S. at 488; *see also Maples v. Stegall,* 340 F.3d 433, 438 (6th Cir. 2003) (same) (citing *Coleman,* 501 U.S. at 753).

The denial of effective assistance of counsel may constitute cause for a procedural default, so long as such claim has been presented to the state courts and is not, itself, procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). Here, Petitioner did not appeal the appellate court's decision denying his Rule 26(B) application to the Ohio Supreme Court. Ohio does not permit delayed appeals in Rule 26(B) proceedings. Rule 7.01(A) (4) (c), Ohio Supreme Court Rules of Practice. Therefore, because the claim of ineffective assistance of appellate counsel has not been preserved as a separate claim, it cannot constitute cause for petitioner's procedural default. *Edwards v. Carpenter*, 529 U.S. at 451-52.

---

Further, the record fails to reflect that he can meet the requirements for the filing of an untimely petition for post conviction relief. See O.R.C. § 2953.23.

Petitioner asserts that this case involves a manifest miscarriage of justice and that he is actually innocent of the charges against him.  The United States Supreme Court has held that a claim of actual innocence may be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims."  *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995).  "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."  *Murray,* 477 U.S. at 496. In *Schlup,* the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally-barred habeas petition. *Schlup,* 513 U.S. at 317.  The actual innocence claim in *Schlup* is "'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" *Id.* at 315 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

The actual innocence exception allows a petitioner to pursue her constitutional claims if it is "more likely than not" that new evidence not previously presented at trial would allow no reasonable juror to find her guilty beyond a reasonable doubt.  *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005). The Court of Appeals for the Sixth Circuit explained the exception thoroughly in *Souter:*

> The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup,* 513 U.S. at 316, 115 S.Ct. 851, 130 L.Ed.2d 808.  Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id*. at 317, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808.

13

> To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-- that was not presented at trial." *Schlup,* 513 U.S. at 324, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id.* at 321, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808.

*Souter,* 395 F.3d at 589–90 (footnote omitted).  Petitioner does not meet these standards. The Court's independent review of the petition and record fails to reveal that any "new facts" have arisen that undermine the result of Petitioner's trial. Petitioner cannot, therefore, establish a claim for actual innocence sufficient to avoid his procedural default.

Petitioner's claim that the evidence is constitutionally insufficient to sustain his convictions all but Count 3 of the *Indictment* is waived.

**Merits**

**Standard of Review**

Petitioner seeks habeas relief under 28 U.S.C. § 2254. The Antiterrorism and Effective Death Penalty Act ("AEDPA") sets forth standards governing this Court's review of state-court determinations. The United State Supreme Court recently described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow,* —— U.S. ——, ——, 134 S.Ct. 10, 16 (2013) (quoting *Harrington v. Richter,* —— U.S. –

─── , ───, 131 S.Ct. 770, 786 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010)

("AEDPA . . .  imposes a highly deferential standard for evaluating state-court rulings, and

demands that state-court decisions be given the benefit of the doubt." (internal quotation marks,

citations, and footnote omitted)).

　　　The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. §

2254(e)(1) provides:

> In a proceeding instituted by an application for a writ of habeas
> corpus by a person in custody pursuant to the judgment of a State
> court, a determination of a factual issue made by a State court shall
> be presumed to be correct. The applicant shall have the burden of
> rebutting the presumption of correctness by clear and convincing
> evidence.

"Under AEDPA, a writ of habeas corpus should be denied unless the state court decision was

contrary to, or involved an unreasonable application of, clearly established federal law as

determined by the Supreme Court, or based on an unreasonable determination of the facts in light

of the evidence presented to the state courts."  *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013)

(citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)); 28 U.S.C. § 2254(d)(1) (a petitioner

must show that the state court's decision was "contrary to, or involved an unreasonable

application of, clearly established federal law"); 28 U.S.C. § 2254(d)(2) (a petitioner must show

that the state court relied on an "unreasonable determination of the facts in light of the evidence

presented in the State court proceeding"). The United States Court of Appeals for the Sixth

Circuit explained these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent
> if (1) "the state court arrives at a conclusion opposite to that
> reached by [the Supreme] Court on a question of law[,]" or (2) "the
> state court confronts facts that are materially indistinguishable
> from a relevant Supreme Court precedent and arrives" at a
> different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct.
> 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an

"unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

Coley, 706 F.3d at 748–49. The burden of satisfying the standards set forth in § 2254 rests with the petitioner. *Cullen v. Pinholster*, —–U.S. —––, —––, 131 S.Ct. 1388, 1398 (2011). "In order for a federal court to find a state court's application of [Supreme Court precedent] unreasonable, . . . [t]he state court's application must have been objectively unreasonable," not merely "incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520–21, 123 S.Ct. 2527 (2003) (internal quotation marks omitted)(citing *Williams v. Taylor*, 529. U.S. at 409 and *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)); see also *Harrington v. Richter*, —– U.S. —––, —––, 131 S.Ct. 770, 786 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as "'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In considering a claim of "unreasonable application" under § 2254(d)(1), courts must focus on the reasonableness of the result, not on the reasonableness of the state court's analysis. *Holder v. Palmer,* 588 F.3d 328, 341 (6th Cir. 2009) (" '[O]ur focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not whether the state court considered and discussed every angle of the evidence.'" (quoting *Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir. 2002) (en banc)); *see also Nicely v. Mills*, 521 F. App'x 398, 403 (6th Cir. 2013) (considering evidence in the state court record that was "not expressly considered by the state court in its opinion" to evaluate the reasonableness of state court's decision). Relatedly, in evaluating the reasonableness of a state court's ultimate legal conclusion under § 2254(d)(1), a

court must review the state court's decision based solely on the record that was before it at the time it rendered its decision. *Pinholster,* 131 S.Ct. at 1398. Put simply, "review under § 2254(d)(1) focuses on what a state court knew and did." *Id.* at 1399.

**Claim One**

Petitioner asserts that the evidence is constitutionally insufficient to sustain his conviction on Count 3 of the *Indictment.*[5]   In support, Petitioner argues, *inter alia*, that evidence indicated that the alleged victims had other sexual partners and disciplinary problems.  He asserts that the alleged victims lied.  He has attached portions of the trial transcripts in support of his claim.  The state appellate court rejected this claim, reasoning in relevant part as follows:

> Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law, not fact. *Id.* In determining whether the evidence is legally sufficient to support a verdict, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Robinson*, 124 Ohio St.3d 76, 2009–Ohio–5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

> In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed, but whether, if believed, does the evidence support the verdict. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002–Ohio–2126, ¶ 79–80 (concluding that the evaluation of witness credibility is not proper on a review for the sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP–668, 2009–Ohio–754, ¶ 4, citing *State v.*

---

[5] Count 3 charged Petitioner with unlawfully engaging in fellatio with alleged victim B.H., a child of less than thirteen years of age, in violation of O.R.C. 2907.02.  (ECF No. 6-1, PageID# 138.)

*Woodward*, 10th Dist. No. 03AP–398, 2004–Ohio–4418, ¶ 16 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime").

Appellant argues that there was insufficient evidence to establish that B.H. performed fellatio on him. While B.H. denied performing fellatio on appellant, plaintiff-appellee, the state of Ohio, claims that K.H.'s testimony established that B.H. and appellant engaged in that sex act. Although appellant claims that K.H. was not credible, this court does not examine the credibility of the evidence when reviewing a Crim.R. 29 motion. *Columbus v. McDaniel*, 10th Dist. No. 09AP–879, 2010–Ohio–3744, ¶ 18. Therefore, we consider whether K.H.'s testimony, if believed, established that B.H. performed fellatio on appellant.

K.H. testified that he saw B.H. and appellant on the couch one evening when he was watching television. B.H.'s head was moving side to side under a blanket near appellant's waist. K.H. determined that he was witnessing a "blow-job," which is a term he understands to mean a "girl using her mouth on a man's penis." (Tr. Vol.I, 390.)

Although K.H. did not actually see B.H. have contact with appellant's penis, the jury was permitted to draw reasonable inferences from K.H.'s testimony. State v. Wood, 10th Dist. No. 07AP–162, 2007–Ohio–6380, ¶ 29. Consequently, we conclude, construing the evidence in a light most favorable to the state, that it was reasonable for the jury to infer from K.H.'s testimony that B.H. was performing fellatio on appellant. Because K.H. sufficiently established that fellatio occurred, we hold that the trial court did not err by denying appellant's Crim.R. 29 motion for acquittal. Accordingly, we overrule appellant's first assignment of error.

*State v. J.E.C., Jr.*, 2013 WL 1943998, at *6.

A criminal defendant may be convicted consistent with the United States Constitution only if sufficient evidence exists to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). To determine whether the evidence was sufficient to support Petitioner's conviction, this Court must view the evidence in

the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson,* at 319). The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt." *Id*. (quoting *Jackson*, at 326). "[A] reviewing court 'faced with a record that supports conflicting inferences must presume-- even if it does not appear on the record-- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *Id*. (quoting *Jackson,* at 326).

Under the AEDPA, a state court's determination regarding a sufficiency of evidence claim is entitled a "double layer" of deference. As explained in *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), deference is due the jury's finding of guilt because the standard, announced in *Jackson v. Virginia,* is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Thus, even if *de novo* review of the evidence leads to the conclusion that no rational trier of fact could have so found, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *See also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). This is a substantial hurdle for a habeas petitioner to overcome. For the reasons detailed by the state appellate court, Petitioner has not done so here.

Claim one fails to provide a basis for relief.

**Claim Two**

Petitioner asserts that his convictions are against the manifest weight of the evidence. This Court has consistently held that a claim that a jury's verdict was against the manifest weight of the evidence cannot be considered on its merits in an action for habeas corpus relief filed under 28 U.S.C. § 2254. That is because § 2254 permits federal courts to grant relief to a state

prisoner only if there is a showing that the person is being held in custody in violation of the Constitution or laws of the United States.  Neither the Constitution nor the laws of the United States require reversal of a jury's verdict if it is against the manifest weight of the evidence; such a claim is based entirely on Ohio law. As the Court explained in *Norris v. Warden*, NCI, No. 2:08–CV–732, 2010 WL 582623, *9–10 (S.D. Ohio Feb.11, 2010), adopted and affirmed 2010 WL 883847 (S.D. Ohio Mar. 9, 2010):

> Petitioner's contention . . .  that his convictions are against the manifest weight of the evidence fails to present an issue appropriate for federal habeas corpus review. The Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those who have been convicted without enough proof to allow a rational trier of fact to find guilt beyond a reasonable doubt. *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir. 1983). . . . [U]nder Ohio law, a claim that a verdict was against the manifest weight of the evidence-- as opposed to one based upon insufficient evidence-- requires the appellate court to act as a "thirteenth juror" and review the entire record, weight the evidence, and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1983); *cf. Tibbs v. Florida*, 457 U.S. 31 (1982). Since a federal habeas court does not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review, any claim that petitioner's conviction was against the manifest weight of the evidence cannot be considered by this Court.

*Id.* Thus, Petitioner's claim that his convictions are against the manifest weight of the evidence do not raise an issue regarding federal law and should be dismissed.

**Recommended Disposition**

Therefore, the Magistrate Judge **RECOMMENDS** that that this action be **DISMISSED.**

**Procedure on Objections**

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. 636(B) (1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

**IT IS SO ORDERED**.


 _s/ *Elizabeth A. Preston Deavers*
Elizabeth A. Preston Deavers
United States Magistrate Judge


**Date:  April 25, 2016**